**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| Steven Mayne, ) | |
| ) | **ORDER DENYING PLAINTIFF'S** |
| Plaintiffs, ) | **MOTION FOR SUMMARY** |
| ) | **JUDGMENT AND GRANTING** |
| ) | **DEFENDANT'S MOTION FOR** |
| vs. ) | **SUMMARY JUDGMENT** |
| ) | |
| Andrew Saul, Commissioner of Social ) | |
| Security,[1] ) | Case No. 1:19-cv-019 |
| ) | |
| Defendant. ) | |

Plaintiff Steven Paul Mayne ("Mayne") seeks judicial review of the Social Security Commissioner's denial of his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433, et. seq. Before the court are motions for summary judgment filed by Mayne and Andrew Saul, Commissioner of Social Security Administration ("Commissioner"). For the reasons that follow, Mayne's motion is denied and the Commissioner's motion is granted.

## I.  BACKGROUND

### A.  Procedural History

Mayne protectively filed an application for DIB on July 31, 2017, alleging an onset of disability date of December 1, 2012. (Tr. 32, 164-167). His application was denied initially, upon reconsideration, and, following an administrative hearing, by an Administrative Law Judge

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). See also section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (explaining an action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

("ALJ"). (Tr. 12-30, 31-96). The Appeals Counsel denied his subsequent request for review and adopted the ALJ's order denying Mayne's applications as the Commissioner's final decision. (Tr. 1-11).

Mayne filed the above-captioned action on January 23, 2019, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (Docket Nos. 1, 3-4). He filed a Motion for Summary Judgment on May 28, 2019. (Docket No. 12). The Commissioner filed a combined Motion for Summary Judgment and response to Mayne's motion on July 1, 2019. (Doc. Nos. 14-16). Mayne filed a response to the Commissioner's motion on July 11, 2019. (Doc. No. 17). Thus, the motions have been fully briefed and are ripe for the court's consideration.

### B. Personal History

#### 1. Personal Data and Work History

Mayne was born in 1974. (Tr. 37). He is married and has three children. (Tr. 165) He has completed two years of college. (Tr. 214). He served in the United States Air Force ("USAF") from July 28, 1992, until July 27, 1996, and from November 12, 1996, until November 30, 2012. (Tr. 144, 188-189, 227, 238-239). While in the USAF he worked as a graphic artist, a missile facility manager, and in safety. (Tr. 228, 239-241). The United States Veterans Administration ("VA") has deemed him disabled due to service-connected disabilities. (Tr. 188-189). As of July 12, 2018, his monthly VA benefit was $3,449.09. (Id.).

Mayne suffers from an adjustment disorder with mixed anxiety, depressed mood with obsessive compulsive disorder, a sleep arousal disorder, a temporomandibular joint disorder ("TMJ"), chronic migraines, Achilles' tendonitis, and IgA nephropathy. (Tr. 219-222). He also has a history of shoulder, lower back, knee, and foot issues. (Id.).

### 2.     Relevant Treatment History

Mayne underwent a Compensation and Pension Examination at the VA Hospital in Fargo, North Dakota, on December 20, 2012, or approximately twenty days after his alleged disability onset date. (Tr. 319). The results of Mayne's physical examination were largely unremarkable. (Tr. 320-321). The examiner noted that Mayne had full range of motion in all joints, no swelling or edema, full motor function, a normal gait, and normal strength bilaterally. (Tr. 320, 321, 355, 360). Next, the examiner noted that Mayne had no muscle atrophy, no signs or symptoms of radiculopathy, and exercised regularly with no apparent problems. (Tr. 356-357). The examiner further noted that Mayne's lower back, knee, foot, shoulder, and kidney issues had not appreciably impacted his ability to work but that Mayne was experiencing prostrating attacks of migraine headache pain multiple times per month. (Tr. 322-329, 344-356, 367-372, 425). In regards to Mayne's mental health, the examiner remarked that Mayne had a profile of depression, anxiety, and obsessive-compulsive symptomatology that had likely developed during the course of his military career due to a combination of service and personal stressors and which had seriously compromised his ability to deal with the normal demands of daily life. (Tr. 417-418).

On July 24, 2013, Mayne presented to the 5th Medical Group's medical facility at the Minot Air Force Base (hereafter referred to as "the Clinic") for a followup regarding his anxiety medications. (Tr. 647). He reported that his various medications were working okay, that he was stable, and that he was having no back pain, limb pain, or muscle aches. (Tr. 648-49). On examination, he appeared well oriented, had normal movement in all extremities, had normal motor strength, balance, and gait and stance, and was capable of communicating his thoughts and feelings.

3

(Id.).

On October 29, 2013, Mayne returned to the Clinic for a followup regarding gastrointestinal issues. (Tr. 642). During this visit he complained of jaw pain. (Id.). He was given, among other things, a handout on various stretches to perform along with instructions to continue with his present course of treatment and to follow up with dental. (Tr. 644).

On December 6, 2013, Mayne reported to the Clinic with eye irritation. (Tr. 635). He reported no generalized pain, depression, sleep disturbances, or decreased functioning ability. (Tr. 636).

On February 7, 2014, Mayne returned to the Clinic with complaints of jaw pain. (Tr. 629). He rated his pain as a 2 on a scale of 1 to 10. (Id.). He reported that a mouth guard given to him by his dentist and the muscle relaxers he had been taking afforded him little relief. (Id.). No scans were ordered and medications were prescribed. (Tr. 632). Mayne was directed to continue with his present course of treatment. (Tr. 632).

On February 13, 2014, Mayne's lumbar spine was X-rayed. (Tr. 462). The results of the x-ray showed satisfactory alignment and "small nonspecific superior endplate spurs at L3-L5 without significant degenerative changes otherwise." (Id.).

On March 14, 2014, Mayne presented to Dr. Wayne Martinson for an initial psychiatric evaluation. (Tr. 707-709). Dr. Martinson noted that Mayne had a long history of depression and anxiety with symptoms of OCD and PTSD, was seemingly leading a constricted life, and was experiencing an estimated two to three migraine headaches per week. (Tr. 709). His plan was to increase Mayne's dosage of antidepressants, start Mayne on Propranolol in an effort to reduce the severity and frequency of Mayne's migraine headaches, and have Mayne follow up in three to four

4

weeks.  (Id.).

On April 4, 2014, Mayne returned to Dr. Martinson, reporting that his overall mood was "okay," that he felt somewhat more energetic, and that he believed his OCD symptomology had improved. (Tr. 705).  According to Dr. Martinson's notes,  Mayne brightened slightly as the session progressed and was otherwise alert, attentive, appropriately engaged, and satisfied with his response to medication (Tr. 705-706).

On April 17, 2014, Mayne returned to the Clinic.  (Tr. 615).  He complained of TMJ pain and requested a referral to an oral maxofacial surgeon.  (Tr. 615-16).  In so doing he advised that the oral appliances, muscle relaxants, and anti-inflammatories he had been using provided little relief.  (Id.) He further reported that, his TMJ pain aside, he  had "good general overall feeling/health" and remained capable on most days of engaging in moderate exercise for 30 minutes. (Tr. 615-16).  The results of his physical examination were unremarkable.  (Tr. 617).  He was referred to an oral/maxillofacial surgeon and instructed to follow up in three months if he had any problems.  (Tr. 618).

On April 21, 2014, Mayne reported to Trinity Health for a follow up regarding his IgA nephropathy.  (Tr. 486).  According to the clinical notes, Mayne had no aches and pains and exhibited good range of motion.  (Id.).

On May 12, 2014, Mayne reported to Trinity Health for an evaluation of possible allergic reactions.  (Tr. 481).  According to the treatment notes, he was alert, oriented, clear of speech, and coherent  (Tr. 482-84).  He reported no muscle pain and exhibited no decreased range of motion. (Id.).

On July 14, 2014, Michael McMahon, D.D.S., examined Mayne on referral from the Clinic.

5

(Tr. 474). Dr. McMahon assessed Mayne with stress-induced myofascial pain dysfunction and severe malocclusion. (Tr. 475). Dr. McMahon advised Mayne to consult with an orthodontist or, in the alternative, to return to his dentist for fabrication of an occlusal splint for use at night. (Id.).

Mayne returned to Dr. Martinson on July 24, 2014, reporting that he was on the whole okay, was not feeling anxious, and that the Propranolol had helped with his headaches. (Tr. 703-704). According to the Dr. Martinson's notes, Mayne was alert, attentive, cognitively organized, meaningfully involved throughout the session and seemed to be doing well in terms of his PTSD and anxiety. (Id.). Dr. Martinson adjusted Mayne's medications and directed Mayne to follow up in two months or as otherwise needed. (Tr. 704).

Mayne followed up with Dr. Martinson on October 10, 2014. (Tr. 701). He reported that he was doing fairly well, had no problems with his depression, felt that his anxiety was under control, did not feel his OCD was interfering with the major activities in his life, and his migraines were, "for the most part, prevented." (Id.). Dr. Martinson found him to be attentive and cognitively organized. (Id.).

Mayne returned to Dr. Martinson on February 6, 2015. (Tr. 699-700). Dr. Martinson noted in his progress notes that Mayne was experiencing some mild anxiety but that his psychiatric problems otherwise seemed to be well controlled with medication. (Tr. 700).

Mayne returned to Dr. Martinson on July 16, 2015, reporting some mild depression as well as anxiety, which he attributed to issues he was having with the VA regarding his care. (Tr. 697). He did not want to adjust his medications as he had been tolerating them well and felt that they had been helping with his anxiety, depression, and OCD. (Id.).

On August 13, 2015, Mayne underwent an MRI that had been ordered by Dr. McMahon to

6

rule out occult intracranial pathologies. (Tr. 470). The MRI results revealed nothing of concern. (Id.).

Mayne again returned to Dr. Martinson on February 10, 2016. (Tr. 695). Although alert, attentive, and cognitively organized, he exhibited symptoms, that in Dr. Martinson's view, were suggestive of a slow recurrence of depression. (Id.). Dr. Martinson discontinued Mayne's Zoloft and started him on Fluoxetine. (Id.).

On January 23, 2017, Mayne returned to the Clinic. (Tr. 547). He had no complaints of back pain and had no issues with mobility. (Tr. 548-49). He reported that he was "engag[ing] in 150 minutes of moderate intensity exercise per week AND muscle strengthening activities 2 or more times per week." (Tr. 549). He was released without limitations and with instructions to follow up as needed. (Tr. 550).

On February 16, 2017, Mayne presented to Trinity Health for a followup on his kidney issues. (Tr. 465). The results of his physical examination were unremarkable. (Id.) He was told to follow up annually. (Id.).

Mayne returned to the Clinic on March 10 and April 19, 2017. (Tr. 535-544). Each of the examining physician noted Mayne's lack of back pain, lack of any limitations on his mobility, normal gait, normal affect and appropriate mood, orientation to time and place, and exercise regimen. (Id.).

Mayne presented to Dr. Martinson for the last time on June 16, 2017. (Tr. 693-94). Noting that Mayne was under a lot of stress at home and had experienced some recurrence of depression and anxiety, Dr. Martinson increased his dosage of Fluoxetine and started him on Lorazepam. (Tr. 687-94).

Mayne was seen by Melissa M. Gartner, a licensed clinical counselor, on September 1, 2017, for psychotherapy related to his diagnoses of depression and anxiety. (Tr. 818). According Gartner's notes, Mayne was struggling to cope with his son's mental health issues as well as his own. (Id.). Gartner's plan was for him to return on a bi-weekly basis for psychotherapy. (Id.).

On October 18, 2017, Dr. Martinson completed a Mental Disorder Questionnaire Form in which he described Mayne's mental state as follows. (Tr. 688- 692). Mayne was generally euthymic with increased distress and disyphoria when recounting past work-related trauma. (Id.). Mayne's symptoms of depression, anxiety, and OCD had improved but not remitted with current care. (Id.). Mayne had intrusive flashbacks and intermittent dissociation related to his PTSD but otherwise intact functioning. (Id.). Mayne had reported social withdrawal and exhibited some limitations with respect to attention and task completion but had zero problems when it came to attending to his personal needs. (Id.).

Meanwhile Mayne continued to visit Gartner on an almost biweekly basis until June 7, 2018, when he canceled his appointment without explanation. (Tr. 819-55). In her notes from these sessions, Gartner documented an improvement in Mayne's symptoms along with the efforts undertaken by Mayne to address the major stressors in his life. (Id.).

    **C.**    **Assessments of Consulting Physicians**

        **1.**    **Dr. Gurcharan Singh's Assessment**

On September 25, 2017, Dr. Gurcharan Singh, a state agency medical consultant, issued a report in which he opined that Mayne remained physically capable of working. (Tr. 77-79). Based upon his review of the documentation provided to him, Dr. Singh concluded that, from a physical standpoint, Mayne had the residual function capacity ("RFC") to perform heavy/very heavy work.

(Tr. 78). In the process of reaching this conclusion, Dr. Singh acknowledged that Mayne's condition had resulted in some limitations on his ability to perform work-related activities. (Tr. 79). Dr. Singh also acknowledged that there was insufficient vocational information to determine whether Mayne could perform any of his past relevant work. (Id.). Dr. Singh nevertheless determined that Mayne could adjust to other work based upon the available information. (Id.).

### 2. Dr. Joan Joynson's Assessment

On October 30, 2017, Dr. Joan Joyson, another state agency medical consultant, issued a report addressing Mayne's mental RFC. (Tr. 75-77). Based upon her review of the information available to her, she concluded that Mayne was not significantly limited when it came to carrying out instructions, performing activities within a schedule, maintaining a schedule, sustaining a routine, working in close proximity to others without distraction, making simple work-related decisions, and maintaining socially appropriate behavior. (Tr. 75-76). She further concluded that Mayne's ability to maintain attention and concentration for extended periods, interact appropriately with the general public, and get along with co-workers were moderately limited. (Tr. 75).

### D. Administrative Hearing Testimony

#### 1. Mayne

Mayne testified at the outset of the administrative hearing that his various physical and mental illnesses in combination with the side effects of his prescribed medications and his efforts to simultaneously cope with his son's own mental health struggles had made it difficult to live. (Tr. 37-39). He then went on to testify that suicidal ideations were a recurring issue, that he experienced episodes of extreme sadness on a weekly basis, and that his struggles with OCD were the source of embarrassment for him and aggravation for his family. (Tr. 40-42).

9

When asked about his focus and energy, Mayne responded that his memory and ability to concentrate are almost gone, that his thoughts often race, and that he experiences panic attacks with greater frequency. (Tr. 45-48). When asked about his migraine headaches, he responded that they can strike as frequently as once a week, are prostrating in nature, and require him to retire to a dark room devoid of stimuli. (Id.).

In regards to his daily activities and interactions, Mayne testified that his social circle is ostensibly limited to his wife and kids, that he does not like being around people and thus tends to avoid them, that he does not really feel anything and is not necessarily prone to engage with others, that he does not "keep up" with himself due to forgetfulness and/or indifference, and that his condition has steadily worsened over time. (Tr. 51-54).

Mayne concluded by testifying that his weight tends to fluctuate, that he finds it hard to walk due to bursitis in both knees and a broken toe that did not heal correctly, that his ankles swell, that he tries to stay off of and elevate his feet, and that he tries to avoid doing too much with his right arm on account of his shoulder impingement. (Tr. 55-57, 64).

### 2. Vocational Expert

When examining the vocational expert, the ALJ inquired whether a hypothetical individual of Mayne's age, education, and vocational background could perform Mayne's past relevant work if he: (a) could lift/carry twenty pounds occasionally and ten pound frequently; (b) could sit up to six hours in an eight-hour workday; (c) could stand and work up to six hours in an eight-hour workday; (d) could occasionally reach overhead use hand controls with his right upper extremity; (e) could occasionally use foot controls with the left lower extremity; (f) could understand, remember, and carry out simple work instructions; and (g) could occasionally interact with

supervisors, coworkers, and the general public. (Doc. No. 59). The vocational expert responded that such an individual would not be capable of performing work as heavy has he had in the past. (Id.).

After the vocational expert had responded to the ALJ's hypothetical, Mayne's counsel was afforded an opportunity for examination. Counsel proceeded to ask the vocational expert in a series of questions whether three unscheduled absences of work per month, an inability to maintain focus and concentration for two-hour blocks of time, intrusive thoughts and repetitive behaviors, an expected twenty percent decrease in productivity, and the inability to adhere to a strict work schedule would preclude competitive employment. (Tr. 61 and 63). In each instance the vocational expert responded in the affirmative. (Id.).

### E.     ALJ's Decision

The ALJ issued her written decision denying Mayne's application on October 9, 2018. (Tr. 15-26). When reviewing the application, the ALJ employed the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520. (Id.).

At step one, the ALJ recognized that Mayne had not engaged in any substantial gainful activity from his alleged onset date through December 31, 2017, the date on which he last met the SSA's insured status requirements. (Tr. 17). At step two, she recognized that Mayne had the following severe impairments: degenerative disc disease of the lumbar spine; Achilles' tendonitis; right shoulder impingement; degenerative joint disease to the left knee; residuals of left foot and toe fracture; adjustment disorder; and OCD. She deemed Mayne's other impairments, i.e., TMJ, nephropathy, and migraines, to be "non-severe." (Tr. 17-18).

Moving on to step three, the ALJ determined that Mayne's various impairments alone or combination did not meet or medically equal any of the presumptively disabling impairments listed

11

at 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 18).

At step four, the ALJ assessed Mayne's RFC, that is, Mayne's ability to do sustained work-related physical and mental activities in a work setting on a regular basis. (Tr. 19-25). Based upon her review of the evidence, the ALJ made the following determination:

> [T]he claimant had the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b) except the claimant is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently. The claimant is limited to sitting (with normal breaks) for about 6 hours out of an 8-hour workday. The claimant is limited to standing or walking (with normal breaks) for about 6 hours out of an 8-hour workday. The claimant is occasional overhead reaching with the right upper extremity. The claimant is limited to occasional operation of foot controls with the left lower extremity. Mentally, the claimant is limited to understanding, remembering and carrying out simple work instructions. The claimant is limited to occasional interaction with supervisors, coworkers and the general public.

(Id.). In making this determination, the ALJ acknowledged that Mayne's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms. (Tr. 20.). However, the ALJ did not find Mayne's statements regarding the intensity, persistence and limiting effects of these symptoms to be entirely consistent with the medical evidence and other evidence in the record. (Id.).

Moving on to the fifth and final step of his analysis, the ALJ recognized that Mayne was unable to perform any of his past relevant work. (Tr. 25). However, based upon the vocational expert's testimony, she concluded that Mayne was capable of making a successful adjustment to other work that existed in significant numbers in the national economy given his age, education, work experience, and RFC. (Tr. 26). In reaching this conclusion, she acknowledged that Mayne's ability to perform all requirements of light work was impeded by a limitation on his ability to reach overhead, but added that the vocational expert had accounted for this additional limitation in his

testimony. (Tr. 25-26).

## II. APPLICABLE LAW

### A. Law Governing the Eligibility for Benefits

A claimant is considered disabled for purposes of DIB if he or she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. See 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A); see e.g., Hilkenmeyer v. Barnhart, 380 F.3d 441, 443 (8th Cir. 2004); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. §§ 404.1520(a)(4) and determine:

(1) whether the claimant is presently engaged in a substantial gainful activity,

(2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4) whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Upon reaching the fourth or fifth steps, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ is required to make the RFC determination based on all relevant

evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id.; 20 C.F.R. §§ 404.1529 and 16.929. Claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall, 274 F.3d at 1218.

### B. Standard of Review

Upon review of the entire record, the court can affirm, modify, or reverse the decision of the Commissioner, with or without remanding the case for rehearing. 42 U.S.C. § 405(g). To affirm the Commissioner's decision, the court must find that substantial evidence appearing in the record as a whole supports the decision. Id.; see also Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). As the Eighth Circuit has repeatedly stated, the "substantial evidence on the record as a whole" standard demands more rigorous review than the "substantial evidence" standard:

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citing Wilson v. Sullivan, 886 F.2d 172, 175 (9th Cir. 1989)); see also Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).

Under the substantial evidence standard, it is possible for reasonable persons to reach

contrary, inconsistent results. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id.

The court may disturb an ALJ's decision only if the decision lies outside the available "zone of choice." Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007) (citation omitted). An ALJ's decision is not outside the "zone of choice" simply because a court might have reached a different result had it been the initial trier of fact. Id.

### III. DISCUSSION

Mayne asserts that the record as a whole supports a finding of disability notwithstanding the ALJ's contrary conclusion. In the alternative, Mayne asserts that this matter should be remanded because the ALJ failed to consider all of his impairments and otherwise erred when assessing his RFC. He broadly objects to the ALJ credibility assessment and RFC determination.

#### A. The ALJ's Credibility Assessment

Mayne asserts that the ALJ improperly discounted his testimony and otherwise failed to address several of his impairments, specifically, his sleep disorder, chronic fatigue, and migraines, the combined effects of his impairments, the intensity and severity of his symptoms, and the side effects of his medication. He further avers that the ALJ was wrong to extrapolate that he could perform regular work based upon his ability to perform some menial day-to-day tasks. He emphasizes that the VA had deemed him totally disabled.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication;

precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005) ("Ellis"). A claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218. The court should "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Perks v. Astrue, 687 F.3d 1086, 1091 (8th Cir. 2012) (quoting Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005)).

The record reflects that the ALJ did consider multiple factors when assessing Mayne's credibility. She acknowledged that Mayne's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. 22). She nevertheless found that Mayne's statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the objective medical evidence or other evidence in the record. (Tr. 20-24). She then proceeded to contrast his statements with medical evidence that she viewed as being inconsistent with Mayne' claims. This included: (1) records from 2012 through 2017 that reflected nothing remarkable or of concern from a physical standpoint: (2) the results of an MMPI Mayne underwent in December 2012 that were interpreted to show a marked exaggeration of symptoms; (2) a January 2013 Global Assessment of Functioning (GAF) score suggestive of mild symptoms and limitations related to multiple family stressors and anxiety; (3) reports from March and April 2013 of Mayne's compliance with medications with good results; (4) psychiatric observations of Mayne from July 2013 through 2018 reflecting some initial setbacks followed by marked progress in his ability manage his symptoms and maintain a modicum of stability; (5) the relatively

conservative nature of his treatment and the longs breaks between visits; and (5) minimal diagnostic findings and the objective findings on physical examination. (Tr. 22-24).

Despite Mayne's contentions, the court finds that the ALJ did address, migraines and fatigue, albeit briefly.  For example, at step two of her analysis, she deemed the migraines non-severe.  She again mentioned Mayne's migraines and the rating assigned to them by the VA when discussing the VA's disability determinations. The fact that she did not dwell extensively on Mayne's migraines is not really surprising, however, as the last mention of them in the objective medical records was on July 24, 2014, when Mayne reported to his examining physician that the Propranolol he had been prescribed for them was working. As for Mayne's reported fatigue, the record bears out that she considered it in conjunction with his weight when assessing his residual functional capacity.

The court also finds that the ALJ adequately considered Mayne's activities of daily living when assessing Mayne's credibility.  The ALJ  took inventory of Mayne's activities of daily living and his capacity to attend to his own personal care, cook simple meals, mow his lawn, drive, and shop.  (Id.).  In so doing she noted the dearth of limitations observed or commented on by Mayne's psychiatric providers.  (Id.)  This evidence, while not determinative, lent further support to her finding that Mayne could perform a range of light work activity that was simple in nature.  (Tr. 22-23).

The fact that the VA had previously determined Mayne to be disabled is not determinative. While another agency's disability ratings are relevant and  instructive, they do not bind the ALJ when evaluating whether a claimant is disabled for purposes of Social Security disability benefits. See Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006). Here, the ALJ considered the VA's disability rating verifications in her decision and ultimately afforded them less weight because the VA uses a different method of establishing benefit eligibility than the Social Security

17

Administration.

The ALJ thoroughly evaluated the record and gave specific reasons for finding Mayne's account not fully credible. See Gregg v. Barnhardt, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). Her interpretation of Mayne's statements were not beyond the pale and the court is mindful that it is prohibited from substituting its own judgment in place of the ALJ's interpretation or weighing of the evidence de novo. See Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997). After reviewing the ALJ's decision and the record, the court concludes that, because the ALJ gave several valid reasons for her determination that Mayne was not entirely credible, her credibility determination is entitled to deference. Accordingly, the court finds substantial support in the record for the ALJ's conclusions.

### B.     The ALJ's RFC Determination

Mayne next challenges the ALJ's RFC as it pertains to his ability to: (1) sit or stand without changing positions for extended periods of time; (2) perform repetitive movements with his hands and arms on a sustained basis; and (3) perform at a pace and persistence required for competitive employment. He again asserts that the ALJ failed to address all of his impairments and properly credit his subjective complaints. He further asserts that the ALJ failed to account for the frequent breaks and unscheduled absences he would require. Finally, citing the vocational expert's testimony, he further asserts such breaks and absences would preclude employment.

The ALJ is responsible for determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of his limitations. See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). The

record reflects that, when assessing Mayne's RFC, the ALJ considered all of his symptoms, the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, the medical opinions and prior medical findings, and Mayne's own account of his activities of daily living and other functional abilities.

The ALJ accounted for Mayne's various medical conditions in her RFC assessments, including fatigue and pain caused by his impairments. She found Mayne was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for about 6 hours out of an 8 hour workday; standing or walking for about 6 hours out of an 8 hour workday; occasional overhead reaching with right upper extremity; occasional operation of hand controls with the right upper extremity; and occasional operation of foot controls with the left lower extremity. Finally, she found Mayne was limited to understanding, remembering, and carrying out simple work instructions, as well as occasional interaction with supervisors, coworkers, and the general public.

There is nothing remarkable with respect to Mayne's physical condition buried in the medical records. Rather, they bear out that he retained normal range of motion, normal strength, normal gait, and unlimited mobility. (Tr. 320, 353-59, 464, 477, 482-86, 534- 50, 569-73). There, is also the evidence regarding his daily activities and statements regarding his exercise regimen. Thus, the objective medical evidence of record supports the ALJ's physical RFC assessment.

The same can be said with respect to the ALJ's mental RFC assessment. As discussed in detail above, it is apparent from the medical records that Mayne's course of treatment was on the conservative side, that Mayne responded well to his medications, that Mayne's thought process were logical and intact without suicidal ideation, and that Mayne was otherwise making progress in addressing the sources of stress in his life.

Two consulting physicians who reviewed these records opined that Mayne retained the

mental RFC to follow simple work instructions, maintain a regular work schedule, adapt to workplace changes for routine work related functions, respond appropriately to others. They further opined that Mayne was best suited for work having low public contact and few coworkers. ALJ afforded significant weight to these opinions because they were supported by substantial medical evidence in the record. The fact she did so is not tantamount to error. See Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004); 20 C.F.R. § 404.1513a(b)(1) (2017) (explaining that state agency physicians are "highly qualified" experts in evaluation of disability claims, and their opinions are to be treated as expert opinion evidence).

In sum, the court finds that the there is substantial evidence to support the ALJ's RCF determination.

### IV.     CONCLUSION

The court finds there is substantial evidence in the record to support the Commissioner's decision. Accordingly, the Commissioner's Motion for Summary Judgment (Doc. No. 14) is **GRANTED**, Mayne's Motion for Summary Judgment (Doc. No. 12) is **DENIED**, and the Commissioner's final decision is affirmed.

**IT IS SO ORDERED.**

Dated this 3rd day of August, 2020..

>     */s/ Clare R. Hochhalter*
>     Clare R. Hochhalter, Magistrate Judge
>     United States District Court